UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

*Delcid v. TCP Hot Acquisition LLC*

*Case No. 1:21-cv-09569*

# DECLARATION OF BRIAN T. FITZPATRICK

I. BACKGROUND AND QUALIFICATIONS

1.  I am a Professor of Law at Vanderbilt University in Nashville, Tennessee. I joined the Vanderbilt law faculty in 2007, after serving as the John M. Olin Fellow at New York University School of Law in 2005 and 2006. I graduated from the University of Notre Dame in 1997 and Harvard Law School in 2000. After law school, I served as a law clerk to The Honorable Diarmuid O'Scannlain on the United States Court of Appeals for the Ninth Circuit and to The Honorable Antonin Scalia on the United States Supreme Court. I also practiced law for several years in Washington, D.C., at Sidley Austin LLP. My C.V. is attached as Exhibit 1. I speak only for myself and not for Vanderbilt.

2.  My teaching and research at Vanderbilt have focused on class action litigation. I teach the Civil Procedure, Federal Courts, and Complex Litigation courses. In addition, I have published a number of articles on class action litigation in such journals as the University of Pennsylvania Law Review, the Journal of Empirical Legal Studies, the Vanderbilt Law Review, the NYU Journal of Law & Business, the Fordham Law Review, and the University of Arizona Law Review. My work has been cited by numerous courts, scholars, and media outlets such as the New York Times, USA Today, and Wall Street Journal. I have also been invited to speak at symposia and other events about class action litigation, such as the ABA National Institutes on Class Actions in 2011, 2015, 2016, 2017, and 2019; the Annual Conference of the ABA's

1

Litigation Section in 2021; and the ABA Annual Meeting in 2012. Since 2010, I have also served on the Executive Committee of the Litigation Practice Group of the Federalist Society for Law & Public Policy Studies. In 2015, I was elected to the membership of the American Law Institute.

3. In December 2010, I published an article in the Journal of Empirical Legal Studies entitled *An Empirical Study of Class Action Settlements and Their Fee Awards*, 7 J. Empirical L. Stud. 811 (2010) (hereinafter "*Empirical Study*"). This article is still what I believe to be the most comprehensive examination of federal class action settlements and attorneys' fees that has ever been published. Unlike other studies of class actions, which have been confined to one subject matter or have been based on samples of cases that were not intended to be representative of the whole (such as settlements approved in published opinions), my study attempted to examine *every* class action settlement approved by a federal court over a two-year period (2006-2007). *See id*. at 812-13. As such, not only is my study an unbiased sample of settlements, but the number of settlements included in my study is also several times greater than the number of settlements per year that has been identified in any other empirical study of class action settlements: over this two-year period, I found 688 settlements, including 109 from the Second Circuit alone. *See id*. at 817. I presented the findings of my study at the Conference on Empirical Legal Studies at the University of Southern California School of Law in 2009, the Meeting of the Midwestern Law and Economics Association at the University of Notre Dame in 2009, and before the faculties of many law schools in 2009 and 2010. Since then, this study has been relied upon regularly by courts, scholars, and testifying experts.[1]

---

[1] *See, e.g.*, *Silverman v. Motorola Solutions, Inc.*, 739 F.3d 956, 958 (7th Cir. 2013) (relying on article to assess fees); *Kuhr v. Mayo Clinic Jacksonville*, No. 3:19-cv-453-MMH-MCR, 2021 WL 1207878, at *12-13 (M.D. Fla. Mar. 30, 2021) (same); *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, No. 11 MD 2262 (NRB), 2020 WL 6891417, at *3 (S.D.N.Y. Nov. 24, 2020)

(same); *Shah v. Zimmer Biomet Holdings, Inc.*, No. 3:16-cv-815-PPS-MGG, 2020 WL 5627171, at *10 (N.D. Ind. Sept. 18, 2020) (same); *In re GSE Bonds Antitrust Litig.*, No. 19-cv-1704 (JSR), 2020 WL 3250593, at *5 (S.D.N.Y. June 16, 2020) (same); *In re Wells Fargo & Co. S'holder Derivative Litig.*, No. 16-cv-05541-JST, 2020 WL 1786159, at *11 (N.D. Cal. Apr. 7, 2020) (same); *Arkansas Teacher Ret. Sys. v. State St. Bank & Trust Co.*, No. CV 11-10230-MLW, 2020 WL 949885, 2020 WL 949885, at *52 (D. Mass. Feb. 27, 2020), *appeal dismissed sub nom. Arkansas Tchr. Ret. Sys. v. State St. Corp.*, No. 20-1365, 2020 WL 5793216 (1st Cir. Sept. 3, 2020) (same); *In re Equifax Inc. Customer Data Sec. Breach Litig.*, No. 1:17-MD-2800-TWT, 2020 WL 256132, at *34 (N.D. Ga. Jan. 13, 2020) (same); *In re Transpacific Passenger Air Transp. Antitrust Litig.*, No. 3:07-cv-05634-CRB, 2019 WL 6327363, at *4-5 (N.D. Cal. Nov. 26, 2019) (same); *Espinal v. Victor's Cafe 52nd St., Inc.*, No. 16-CV-8057 (VEC), 2019 WL 5425475, at *2 (S.D.N.Y. Oct. 23, 2019) (same); *James v. China Grill Mgmt., Inc.*, No. 18 Civ. 455 (LGS), 2019 WL 1915298, at *2 (S.D.N.Y. Apr. 30, 2019) (same); *Grice v. Pepsi Beverages Co.*, 363 F. Supp. 3d 401, 407 (S.D.N.Y. 2019) (same); *Alaska Elec. Pension Fund v. Bank of Am. Corp.*, No. 14-CV-7126 (JMF), 2018 WL 6250657, at *2 (S.D.N.Y. Nov. 29, 2018) (same); *Rodman v. Safeway Inc.*, No. 11-cv-03003-JST, 2018 WL 4030558, at *5 (N.D. Cal. Aug. 23, 2018) (same); *Little v. Washington Metro. Area Transit Auth.*, 313 F. Supp. 3d 27, 38 (D.D.C. 2018) (same); *Hillson v. Kelly Servs. Inc.*, No. 2:15-cv-10803, 2017 WL 3446596, at *4 (E.D. Mich. Aug. 11, 2017) (same); *Good v. W. Virginia-Am. Water Co.*, No. 14-1374, 2017 WL 2884535, at *23, *27 (S.D.W. Va. July 6, 2017) (same); *McGreevy v. Life Alert Emergency Response, Inc.*, 258 F. Supp. 3d 380, 385 (S.D.N.Y. 2017) (same); *Brown v. Rita's Water Ice Franchise Co. LLC*, No. 15–3509, 2017 WL 1021025, at *9 (E.D. Pa. Mar. 16, 2017) (same); *In re Credit Default Swaps Antitrust Litig.*, No. 13MD2476 (DLC), 2016 WL 2731524, at *17 (S.D.N.Y. Apr. 26, 2016) (same); *Gehrich v. Chase Bank USA, N.A.*, 316 F.R.D. 215, 236 (N.D. Ill. 2016); *Ramah Navajo Chapter v. Jewell*, 167 F. Supp 3d 1217, 1246 (D.N.M. 2016); *In re: Cathode Ray Tube (Crt) Antitrust Litig.*, No. 3:07-cv-5944 JST, 2016 WL 721680, at *42 (N.D. Cal. Jan. 28, 2016) (same); *In re Pool Products Distribution Mkt. Antitrust Litig.*, No. MDL 2328, 2015 WL 4528880, at *19-20 (E.D. La. July 27, 2015) (same); *Craftwood Lumber Co. v. Interline Brands, Inc.*, No. 11–cv–4462, 2015 WL 2147679, at *2-4 (N.D. Ill. May 6, 2015) (same); *Craftwood Lumber Co. v. Interline Brands, Inc.*, No. 11–cv–4462, 2015 WL 1399367, at *3-5 (N.D. Ill. Mar. 23, 2015) (same); *In re Capital One Tel. Consumer Prot. Act Litig.*, 80 F. Supp. 3d 781, 797 (N.D. Ill. 2015) (same); *In re Neurontin Marketing and Sales Practices Litig.*, 58 F.Supp.3d 167, 172 (D. Mass. 2014) (same); *Tennille v. W. Union Co.*, No. 09–cv–00938–JLK–KMT, 2014 WL 5394624, at *4 (D. Colo. Oct. 15, 2014) (same); *In re Colgate-Palmolive Co. ERISA Litig.*, 36 F. Supp. 3d 344, 349-51 (S.D.N.Y. 2014) (same); *In re Payment Card Interchange Fee & Merchant Discount Antitrust Litig.*, 991 F. Supp. 2d 437, 444-46 & n.8 (E.D.N.Y. 2014) (same); *In re Fed. Nat'l Mortg. Association Sec., Derivative, and "ERISA" Litig.*, 4 F. Supp. 3d 94, 111-12 (D.D.C. 2013) (same); *In re Vioxx Prod.*

4. In addition to my empirical works, I have also published many law-and-economics papers on the incentives of attorneys and others in class action litigation. *See, e.g.*, Brian T. Fitzpatrick, *A Fiduciary Judge's Guide to Awarding Fees in Class Actions*, 89 Fordham L. Rev. 1151 (2021); Brian T. Fitzpatrick, *Do Class Action Lawyers Make Too Little*, 158 U. Pa. L. Rev. 2043 (2010) (hereinafter "*Class Action Lawyers*"); Brian T. Fitzpatrick, *The End of Objector Blackmail?*, 62 Vand. L. Rev. 1623 (2009). Much of this work was discussed in a book published by the University of Chicago Press entitled THE CONSERVATIVE CASE FOR CLASS ACTIONS (2019). The thesis of the book is that the so-called "private attorney general" is superior to the public attorney general in the enforcement of the rules that free markets need in order to operate effectively and that courts should provide proper incentives to encourage such private attorney general behavior. I will draw upon this work in this declaration.

5. I have been asked by class counsel to opine on the social value of the class action settlement they have secured in this case. This is one of the factors the Second Circuit instructs the Court to consider when assessing class counsel's fee request. *See Goldberger v. Integrated Resources, Inc.*, 209 F.3d 43, 50 (2d Cir. 2000) ("public policy considerations"). In order to formulate my opinion, I reviewed a number of documents provided to me by class counsel, and I

---

*Liab. Litig.*, No. 11–1546, 2013 WL 5295707, at *3-4 (E.D. La. Sep. 18, 2013) (same); *In re Black Farmers Discrimination Litig.*, 953 F. Supp. 2d 82, 98-99 (D.D.C. 2013) (same); *In re Se. Milk Antitrust Litig.*, No. 2:07–CV 208, 2013 WL 2155387, at *2 (E.D. Tenn., May 17, 2013) (same); *In re Heartland Payment Sys., Inc. Customer Data Sec. Breach Litig.*, 851 F. Supp. 2d 1040, 1081 (S.D. Tex. 2012) (same); *Pavlik v. FDIC*, No. 10 C 816, 2011 WL 5184445, at *4 (N.D. Ill. Nov. 1, 2011) (same); *In re Black Farmers Discrimination Litig.*, 856 F. Supp. 2d 1, 40 (D.D.C. 2011) (same); *In re AT & T Mobility Wireless Data Servs. Sales Tax Litig.*, 792 F. Supp. 2d 1028, 1033 (N.D. Ill. 2011) (same); *In re MetLife Demutualization Litig.*, 689 F. Supp. 2d 297, 359 (E.D.N.Y. 2010) (same).

have attached a list of these documents in Exhibit 2. My compensation for this declaration was a flat fee in no way dependent on the outcome of class counsel's fee petition.

6. As I explain below, I believe this settlement offers considerable social value from the perspectives of both compensation and deterrence. It is the kind of the settlement that should be incentivized with a proper fee award.

II. CASE BACKGROUND

7. This settlement arises out of litigation over benzene contamination and the risk of benzene contamination in certain of Defendants' antiperspirant consumer products. On November 18, 2021, Plaintiffs Otto Delcid ("Delcid") and Luz Roman ("Roman") filed a class action complaint in this Court against Unilever United States, Inc., relying *inter alia* on a petition to the Food & Drug Administration filed by an analytical pharmacy called Valisure LLC as well as on their own independent testing. The complaint, one among many filed after Valisure's petition, alleged that the Defendants failed to test and improperly marketed and sold several antiperspirants and deodorants that allegedly contained benzene in violation of state law. The complaint sought injunctive relief and compensation for alleged economic losses sustained by U.S. consumer purchasers of the products. In particular, the complaint alleged violations of New York, California, and Florida consumer protection laws and claims for breach of express and implied warranties, fraud, and unjust enrichment resulting from the presence of benzene in Sure® and Brut® branded antiperspirant spray products. Eventually, after Plaintiffs shared their independent testing results that confirmed the presence of benzene in these products, the Defendants commenced a nationwide recall and offered refunds for the returned products. The Defendants nonetheless filed a motion to dismiss this lawsuit, and, while it was pending, the parties proceeded to mediation conducted by the Honorable Stephen Gold (Ret.) and reached a settlement. The Court certified a settlement

class and preliminarily approved the settlement on October 28, 2022 (as well as an amendment thereto on December 13, 2022).

8. The settlement class includes "all natural persons who, between November 15, 2015 and the date of Preliminary Approval, purchased in the United States [Brut Classic Antiperspirant Aerosol (4 oz) (UPC 00827755070085), Brut Classic Antiperspirant Aerosol (6 oz) (UPC 000827755070108), Sure Regular Antiperspirant Aerosol (6.0 oz) (UPC 00883484002025), Sure Unscented Antiperspirant Aerosol (6.0 oz) (UPC 00883484002278), or Brut Classic Deodorant Aerosol (10 oz) (UPC 00827755070047)] for personal, family, or household use, and not resale." *See* Settlement Agreement ¶¶ 2.21, 2.35; Rider to Settlement Agreement ¶¶ 2.11, 9.18. The class will release the Defendants from, among other things, any claim related to "economic injuries related to the presence of benzene in the Covered Products . . . ." *Id*. at ¶ 8.3. All claims for personal and/or bodily injury are expressly excluded from the release. *See id*. In exchange, the Defendants will pay $3.65 million in cash that, after the deduction of attorneys' fees, service awards, and other administrative expenses, will be distributed *pro rata* to over 328,438 members of the class who filed claims. *See id*. at ¶ 3.1; Weisbrot Declaration ¶ 10. These claims are estimated to comprise 26% of the class. *See* Weisbrot Declaration ¶ 10. None of the money will revert back to the Defendants. *See* Settlement Agreement ¶ 3.5. The Defendants also agreed to test these products for benzene contamination for at least the next 18 months. *See id*. at ¶ 4.2. Class counsel is seeking one-third in fees for the common fund they created.

III. ASSESSMENT OF THE SOCIAL VALUE OF THE SETTLEMENT

9. As I explain in my book THE CONSERVATIVE CASE FOR CLASS ACTIONS, class action lawyers perform a critical law enforcement role in our country—which is why they are often referred to as "private" attorneys general. In Europe, countries rely much more on the government

to police the marketplace. In America, by contrast, we believe more strongly in self-help and the private sector, including to police the marketplace. That is, we need private class action lawyers because it is not desirable for "public" attorneys general to police all wrongdoing. Even if it were desirable, it is simply not possible: "public" attorneys general have very limited resources and are often "captured" by the industries they are supposed to regulate. It is also impossible for individual litigants to police all wrongdoing: sometimes individual claims are too small to be viable on their own, and, even when they are viable, individuals do not have the incentive to invest in one claim the same way a defendant facing many similar claims does; as a result, the playing field between individual plaintiffs and defendants is often not level. *See* Fitzpatrick, *Class Action Lawyers*, *supra*, at 2059. Class action lawyers level the playing field and overcome the enforcement gap that would otherwise exist in our country by aggregating non-viable and underinvested claims into effective litigation vehicles. *See id*.

10. In this case, there is no doubt that individuals could not have pursued the Defendants on their own; the claims are simply too small. Although it was not impossible for the government to do so, for whatever reason, the government has not. The contamination here was brought to light by a private laboratory and even when the contamination came to light the government did nothing. To the contrary: the Food & Drug Administration has gone after Valisure and taken no action whatsoever on its petition. In my opinion, this is exactly the type of situation in which we need private class action lawsuits if we want to hold defendants accountable for wrongdoing.

11. But defendants can be held accountable for wrongdoing only if class action lawyers are incentivized to bring meritorious cases and to resolve them for real as opposed to illusory value. It is beyond the scope of my opinion to assess in detail the meritoriousness of this lawsuit, but the

fact that the Defendants recalled the offending products after Plaintiffs shared their testing results is an excellent sign.  Instead, I have been asked to opine on the social value of the resolution of the lawsuit.  In my opinion, social value can be determined by looking to how much compensation it delivers to class members as well as how much deterrence it delivers to society.  Those are the primary purposes of the class action.  In my opinion, this settlement succeeds on both counts.

12. Let me begin with compensation.  One way to look at the compensatory value of the settlement is to look at how much the class members who file claims will receive.  Here, they will receive back the full cost of almost two product units.  *See* Weisbrot Declaration ¶ 12. Although we do not know how many units the average class member purchased, I thought the assumption made by class counsel's expert—6—was reasonable.  *See id.* at ¶ 9.  This means class members who filed claims will get back one-third of what they paid for these products during the class period.  As I explain below, that is probably better than their best-case scenario at trial. Nonetheless, I do not favor this approach because it treats as equivalent settlements that deliver compensation to only a few class members and settlements that deliver compensation to many class members.  It seems clear to me, however, that settlements that deliver the same per capita compensation to more people have a greater compensatory value.  Thus, I prefer to look at how much the settlement recovers for the class as a whole.  Nonetheless, it is worth noting that this settlement will not deliver compensation to only a few class members.  Rather, *many more* class members have filed claims and will receive compensation here than in the typical consumer class action.  The best data we have on claims rates in consumer class actions is from the Federal Trade Commission, which found that the median claims rate is 9% in cases where individual notice could be sent to at least some portion of the class.  *See* FTC Staff Report, Consumers and Class Actions, pp. 21-22, *available at* https://www.ftc.gov/system/files/documents/reports/consumers-class-

actions-retrospectiveanalysis-settlement-campaigns/class_action_fairness_report_0.pdf Here, however, the claims rate is 26%. Thus, even if we focus on the class members who filed claims rather than the class as a whole, this settlement is delivering much more compensation than the typical class action.

13. But, as I said, I prefer to measure compensation by looking at how much the class as a whole will receive. In this case, that is $3.65 million. Unlike some class action settlements, this is real, not illusory, money: none of it can revert back the Defendants. Even still, this figure is only meaningful if we compare it to how much the class as a whole might have recovered at trial. According to class counsel, the best-case scenario for the class at trial was to receive damages equal to full disgorgement of the purchase price for the contaminated products. They have told me that the Defendants sold approximately $30 million of the products covered by the settlement during the class period. However, in my experience, the full disgorgement theory is unlikely to succeed because not all units of product were contaminated and even contaminated products are not completely worthless; i.e., they still have antiperspirant in them. As a result, the more likely legal theory to succeed here was probably one based on the premium class members paid over what they would have paid had they known about the contamination. According to class counsel's economic expert, the best-case, price-premium scenario was around 30% of the purchase price, or $9 million dollars. *See* Boedecker Declaration ¶ 25. Thus, the class as a whole here is recovering somewhere between 12.1% (full disgorgement) and 41% (price premium) of what it might have recovered at trial. In my opinion, even the low end is good compared to recoveries in other class actions, especially given how unlikely the full disgorgement theory was to succeed. But the high end is well above average. Although we don't have good data on recovery rates in consumer class actions, we do in securities and antitrust class actions, and the typical recovery in those cases pales

in comparison to the high-end recovery here. *See, e.g., https://www.nera.com/publications/archive/2023/recent-trends-in-securities-class--action-litigation--2022-full-.html*, at 19 (finding that the median securities fraud class action between 2013 and 2022 settled for between 1.5% and 2.5% of the most common measure of investor losses, depending on the year); John M. Connor & Robert H. Lande, *Not Treble Damages: Cartel Recoveries are Mostly Less Than Single Damages,* 100 Iowa L. Rev. 1997, 2010 (2015) (finding the weighted average of recoveries—the authors' preferred measure—to be 19% of single damages for cartel cases between 1990 and 2014). In my experience reviewing class action settlements, I am fairly confident the high-end recovery here is above average even for consumer cases.

14. Let me turn next to deterrence. I have always been of the opinion that this is the most important social value of consumer class actions. *See* Fitzpatrick, *Class Action Lawyers, supra*, at 2068-69. If companies know that they will have to pay millions of dollars when, for example, they sell contaminated products, they will be more careful about selling contaminated products. If we don't hold companies accountable for small harms, it will be like giving them a greenlight to engage in such harms. Eventually, the greenlighted small harms will add up to significant harm. There are two forms of deterrence: specific deterrence and general deterrence. I discuss both forms of deterrence at length in chapter eight of THE CONSERVATIVE CASE FOR CLASS ACTIONS. In my opinion, this settlement delivers both.

15. Let me begin with specific deterrence. Specific deterrence occurs when the Defendants themselves stop the alleged misconduct. This settlement delivers specific deterrence because it requires the Defendants to begin testing their products for benzene. Maybe the Defendants would have done that anyway given the trouble not testing all these years has gotten them into here, but maybe not. But because of this settlement, we don't have to guess: the

Defendants are required to do it. Presumably, if they find benzene in the future, they will pull those products from the shelves and the legal violations alleged here will be avoided in the future. That is textbook specific deterrence.

16. But there is also general deterrence here. General deterrence occurs when other potential wrongdoers take steps to avoid wrongdoing because they expect to be punished financially if they do not. As I explain in THE CONSERVATIVE CASE FOR CLASS ACTIONS, most of the empirical studies of class action lawsuits find that they have a positive, statistically significant effect on general deterrence. See ID. AT 109-122. In my opinion, this settlement is one that will contribute to this effect. The Defendants have been punished to the tune of $3.65 million, or 12.1% of the entire revenue they collected for all of the products in question sold for many, many years. Few industries operate at profit margins much above 12.1%. This settlement therefore tells corporate executives that, if they are not careful about what they put on the shelves, they will lose their entire profit margins. That is exactly how our civil justice system should work.

17. Sometimes critics of class actions argue that they create no socially useful general deterrence because companies pass the liability on to the very plaintiffs that have sued them. Such a critic here might say the following: consumers will end up paying 100% of this settlement through higher prices but get only 66% of it back through the settlement because the lawyer takes the other third. There is nothing about this critique that is unique to class actions; it could apply to any attempt in our civil justice system to hold a corporation accountable. But the critique assumes that consumers will buy the same amount of the Defendants' products in the future even at the higher prices. Why would that be so? If the Defendants could have sold the same number of units at a higher price, they would have charged the higher price all along. That is, passing liability onto consumers through higher prices causes companies harm in the marketplace as

consumers compare prices of different products against one another. Everything being else equal, scrupulous companies with lower litigation liabilities will be able to charge less than unscrupulous companies with greater litigation liabilities. Over time, the better companies will win out over the worse companies. This is known as the "market allocation" effect of general deterrence. It is one of the ways that forcing companies to internalize the costs that they impose on others has beneficial effects for society. This settlement will contribute to these beneficial effects.

18. For all these reasons, it is my opinion that this settlement is socially valuable and class counsel should therefore be compensated adequately for their efforts to bring it about.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct to the best of my knowledge.

Nashville, TN

March 24, 2023

Brian T. Fitzpatrick

# EXHIBIT 2

Documents reviewed:

- Class Action Complaint (Document 1, filed 11/18/21)
- Consolidated Class Action Complaint (Document 21, filed 1/25/22)
- Settlement Agreement (Document 66-1, filed 10/20/22)
- Order Granting Preliminary Approval of Class Action Settlement (Document 68, filed 10/28/22)
- Rider to Settlement Agreement (Document 70-1, 12/2/22)
- Order Granting Preliminary Approval of Rider to Class Action Settlement Agreement Nunc Pro Tunc (Document 72, filed 12/13/22)
- Plaintiffs' Memorandum of Law in Support of Motion for Final Approval of Class Action Settlement (Document 79, filed 3/8/23)
- Plaintiffs' Memorandum of Law in Support of Motion for Attorneys' Fees, Litigation Costs, and Service Awards (Document 87, filed 3/8/23)
- Transcript of Hearing before Hon. Denise Cote (3/13/23)
- Declaration of Steven Weisbrot of Angeion Group, LLC re: Reach Percentage & Class Member Payments ("Weisbrot Declaration") (filed herewith)
- Declaration of Stefan Boedeker of Berkeley Research Group, LLC re: Price Premium Discussion ("Boedeker Declaration") (filed herewith)